FILED
2020 Sep-01  AM 09:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALFONSO JOHNSON, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:18-CV-1262-CLM** |
| | ) | |
| **BIRMINGHAM BOARD OF** | ) | |
| **EDUCATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Former Athletic Director Alfonso Johnson, Jr. sues the Birmingham Board of Education ("Board"), alleging that the Board fired him because he complained that independent contractors the Board hired to perform repairs did better work at mostly white schools than mostly black schools. (Doc. 1, ¶¶ 27–29). Johnson mainly frames this as a retaliation claim under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, through § 1983. Johnson also alleges that the Board discriminated against him because of his race, in violation of the same statutes.

The Board seeks summary judgment on both claims. (Docs. 25, 26). After considering the evidence, briefs, and applicable law, the court **GRANTS** the Board's motion.

**FACTUAL BACKGROUND**

1. <u>Johnson's Employment and Termination as the Board's Athletic Director</u>

There was no Athletic Director before Johnson; the Birmingham Board eliminated the position after the State Board imposed a staff restructuring and reduction mandate. During that time, the Birmingham Athletic Partnership, a local nonprofit organization, paid Johnson to provide miscellaneous athletic support services to the Board to fill the void. While working in this advisory role, Johnson was not an employee of the Board; he was not asked or expected to assume the duties of Athletic Director; he was not subject to Board direction or supervision; and, his performance was not evaluated by the Board.

The Board hired Johnson as its Athletic Director in February 2014. Johnson's direct supervisor was the Board's Chief Operations Officer ("COO"). At first, the COO was Colonel Ronnie Leonard, an African American. Dr. Matthew Alexander, who is also African American, later replaced Colonel Leonard as COO. Johnson also worked under Board Superintendent Dr. Kelley Castlin-Gacutan, who is African American, and Chief of Staff Steve Zimmerman, who is white.

Early in the fall of 2016, Dr. Alexander (the COO) recommended Johnson's termination to Dr. Gacutan (the Superintendent), because Johnson was set to gain non-probationary status—the equivalent of tenure for non-teaching employees—in

February 2017. Johnson does not dispute that Dr. Alexander was not directed to make his recommendation by any Board official, employee, or member.

Dr. Gacutan agreed with Dr. Alexander's recommendation and presented it to the Board for its consideration and vote in September 2016. As a matter of practice, Dr. Gacutan presented Board members with the reasons regarding termination recommendations before the meeting. Dr. Gacutan's stated reasons for recommending the Board terminate Johnson were that Johnson had ineffective communication skills and Johnson would soon gain non-probationary (tenure) status. The Board—comprised of eight black members and one white member—terminated Johnson's employment in October 2016.

2.    Johnson's Performance as Athletic Director

Johnson did not have a clean sheet when he was terminated. In the fall of 2015, Johnson received a reprimand from Colonel Leonard about an interaction Johnson had with Steve Savarese, the executive director of the Alabama High School Athletic Association ("AHSAA"). Colonel Leonard's letter of reprimand follows:

# Birmingham City Schools

Believe. Create. Succeed.

Date:       September 1, 2015

TO:         Alphonso "Buck" Johnson
            Director, Athletics

FROM:       Ronnie K. Leonard
            Operations Officer

*RE*:       Letter of Reprimand for Conduct Unbecoming

The purpose of this letter is to advise you of an official reprimand for conduct unbecoming during your conversations with Mr. Tony Stallworth, Associate Executive Director, Ms. Wanda Gilliland, Assistant Director, and Mr. Steve Savarese, Executive Director for the Alabama High School Athletic Association (AHSAA).  In his letter dated August 19, 2015 to our Superintendent, Dr. Gacutan, Mr. Savarese highlighted the following that are of concern:

1.  You "...bluntly admonished executive staff for upholding the bylaws..."
2.  You challenged AHSAA rule compliance and accused the Association of "picking on BCSS, particularly PHS"
3.  You stated that the AHSAA was penalizing a child for a technicality, and indicated that "only 50% of the schools follow the bylaws anyway"

As we have discussed, these statements reflect conduct that is unbecoming an employee of Birmingham City Schools and especially one in the position of the District's Director of Athletics. Perhaps you would agree that such conduct does not bode well the BCS students nor represent the professional image of BCS leadership.  We are concerned about the potential irreparable harm this may have caused our relationship with the AHSAA.

Although you have advised that you rendered a verbal apology to Mr. Savarese and he accepted it, you are hereby directed to prepare a formal letter of apology including your commitment as the BCS Athletics Director to abide by and ensure full compliance with the bylaws of the AHSAA. This letter must be submitted to me for review by close of business Wednesday, September 3, 2015.

I firmly expect that any future contact, be it conversations or correspondence with the AHSAA, will be conducted with the utmost respect and professionalism. Please give this memo your serious consideration.

Ronnie K. Leonard

I have received a copy of this memorandum.  I understand that this memorandum will be placed in my personnel file.  I understand that my signature does not necessarily constitute agreement with it content and that I have an opportunity to respond if I disagree.

Alphonso Johnson                    9-2-15
                                    Date

(Doc. 26-4, p. 23).

Johnson claims that this incident was overblown. Johnson says it stems from a conversation he had with Savarese about leniency for a student who received a disciplinary penalty. Johnson claims that when he called Savarese to apologize, Savarese said, "Oh Buck, its no problem. Whatever I can do for you. We didn't really have an issue, we had just never had anyone ask for that." Johnson also claims that Colonel Leonard told Johnson that he would not be reprimanded for the incident and did so only after Zimmerman (the white chief of staff) pressured him.

In the summer of 2016, Dr. Alexander reprimanded Johnson for sending an email to Dr. Alexander, senior staff members, and a Board-hired contractor—who also happened to be the target of the email. In the email, Johnson expressed concerns about the quality of work performed by the contractor on the Board's athletic fields, and Johnson accused the contractor of trying to fight a Board employee.

Johnson claims that he mistakenly sent the email to the contractor because he did not know the difference between "Reply" and "Reply All" because of his age and lack of familiarity with email. (Doc. 33, p. 3–4). Dr. Alexander's letter of concern follows:

July 19, 2016

Mr. Alfonso "Buck" Johnson
District Athletic Director
Birmingham City Schools

RE: Letter of Concern

Dear Mr. Johnson:

As indicated in several of our staff meetings and part of your professional duties as the District Athletic
Director, it is required that you follow the established communication protocol, with regard to any issue
that you might have with internal/external stakeholders and/or contractors. It is a violation of this
established and communicated procedure not to do so.

On June 28, 2016, at 5:33 p.m., you sent an email that included information directed toward a contractor,
Mike Hill (Specialty Turf Services). In this email, you made several allegations about the contractor and
the quality of work performed by the contractor. You are expected to communicate to your immediate
supervisor any concerns or difficulties that you experience with a contractor and/or stakeholder.
However, these actions were not followed. Again, this letter reflects great concern with your failure to
follow this established procedure.

By Monday, July 25, 2016, please submit a letter addressed to Mike Hill (Specialty Turf Services)
apologizing for and rescinding the comments that you made in your email. I am available to discuss this
matter further, if you desire. You may respond to this letter in writing within five (5) days from the date
of the letter. Should you choose to write a response, it will be attached to this letter.

Respectfully,

Matthew Alexander, Jr., Ed.D.
Operating Officer

I acknowledge receipt of this letter.

_____          7/21/16
Employee Signature                        Date

(Doc. 26-4, p. 25).

Finally, Johnson was reprimanded from time-to-time for failing to meet
deadlines. For example, in May 2016, Johnson failed to timely provide Dr.
Alexander with estimated costs for repairs of several football fields. Johnson

disputes that it was possible to perform that task, claiming he was only given three days to do so.

3.      *Johnson's Complaints about Board-Hired Contractors*

Johnson claims that, while he was Athletic Director, he regularly complained at staff meetings that he believed Board-hired contractors performed worse construction and repair work at predominately black schools. The Board's COO (Colonel Leonard and Dr. Alexander, respectively) presided over these meetings. Johnson claims that on at least one occasion, various school principals as well as Zimmerman were present at a meeting in which Johnson voiced such complaints. Johnson does not dispute that the Superintendent, Dr. Gacutan, was unaware of any complaints he made about the lower quality of work the contractors performed at mostly black schools.

Johnson claims that he was terminated because of his complaints. Johnson states in his brief:

> The real reason [Johnson] was terminated was because he complained about the inherent racial disparities between the construction work done on predominately black schools versus predominately white schools, and the contractors Johnson was complaining about just happened to be the ones who typically submitted the lowest bids.

(Doc. 33, p. 16, ¶ 5).

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes show the lack of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Id*. at 324. All factual inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986).

## ANALYSIS

Johnson alleges two claims: (1) that the Board discriminated against him and terminated his employment because of his race ("race discrimination claim"), and (2) that the Board's termination of his employment was an act of unlawful retaliation ("retaliation claim"). While Johnson alleges race discrimination, his complaint and his briefs reveal that his retaliation claim is the core of his case. For instance, Johnson begins his discrimination argument by analyzing an element of a retaliation claim—his involvement in a protected activity—and only minimally concentrates on a discriminatory intent or animus on the part of the Board. (Doc. 33, pp. 18–29). Johnson effectively admits as much in his brief:

> The ***real reason*** [Johnson] was terminated was because he complained about the inherent racial disparities between the construction work done on predominately black schools versus predominately white schools, and the contractors Johnson was complaining about just happened to be the ones who typically submitted the lowest bids.

(Doc. 33, p. 16, ¶ 5) (emphasis added).

That said, the court addresses both claims, starting with the retaliation claim and concluding with the race discrimination claim. Johnson asserts both claims under Title VII of the Civil Rights Act of 1964 and under 42 U.S.C. § 1981, through 42 U.S.C. § 1983. Johnson concedes,[1] and controlling law confirms,[2] that the legal

---

[1] *See* Doc. 52, p. 6.
[2] *See Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (Title VII and §1981 have the "same requirements of proof and use the same analytical framework"); *Cross v.*

elements and analysis of his claims under both Title VII and §§ 1981/1983 are identical. Because Johnson's claims under both the statutes are subject to the same requirements of proof and analytical framework, the court addresses Johnson's Title VII claims (Counts I and III) and applies its analysis implicitly to Johnson's §§ 1981/1983 claims (Counts II and IV).

## I.   Johnson's Retaliation Claim Fails as a Matter of Law.

The court reviews Johnson's retaliation claim under a three-part framework: (1) Johnson proves a prima facie case; (2) the Board offers a nondiscriminatory reason; then, (3) Johnson proves pretext.

Step 1: To establish a prima facie case of retaliation under Title VII, Johnson must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) that there is some causal relation between the two events. *See Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal citations omitted).

An employee engages in protected expression when he opposes practices made unlawful by the relevant statute ("opposition clause") or participates in any way in an investigation under the relevant statute ("participation clause"). *Clover v.*

---

*State of Ala., State Dept. of Mental Health & Mental Retardation*, 49 F.3d 1490, 1508 (11th Cir. 1995) ("When Section 1983 is used as a parallel remedy for violation of [Title VII], the elements of the two causes of action are the same"); *see also Comcast Corp. v. Nat'l Ass'n of African Am.- Owned Media*, 140 S. Ct. 1009, 1014, 206 L. Ed. 2d 356 (2020).

*Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999). Opposition must be based upon a good-faith belief that is objectively reasonable under existing substantive law. *Id.* at 1351.

A causal relation between protected expression and an adverse employment action arises when the defendant was aware of the protected expression and took materially adverse action as a result. *Shannon v. BellSouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). The applicable causation standard is "but-for causation," which requires "proof that the desire to retaliate was the but-for cause of the [adverse action]." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Step 2: If Johnson can establish the prima facie case outlined above, the Board must proffer a legitimate, nondiscriminatory reason for firing Johnson. *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494–95 (11th Cir. 1989); *see also Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).

Step 3: If the Board offers a legitimate, nondiscriminatory reason, Johnson must show that the Board's reason was merely a pretext for unlawful discrimination. *Id.* at 1308. Johnson must show pretext with "concrete evidence in the form of specific facts." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see also Springszer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (pretext may be shown "by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [an employer's] proffered

legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence'") (quoting *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004)). Mere "conclusory allegations and assertions" will not suffice. *Burdine*, 450 U.S. at 256.

Applying this framework, Johnson's claim is due to be dismissed for two reasons. First, Johnson cannot establish a prima facie case of retaliation because he presents no evidence that he engaged in statutorily protected expression or that his termination was caused by any such expression. Second, even if Johnson could establish a prima facie case, Johnson presents no evidence that refutes the Board's legitimate, non-retaliatory reasons for terminating him.

**A. Johnson Did Not Engage in Statutorily Protected Expression.**

Title VII's anti-retaliation provision bars employers from taking adverse action against employees who oppose unlawful employment practices, *as defined by the statute*.[3] So Johnson must show that the Board fired him because he engaged in

---

[3] 42 U.S.C.A. §2000e-2:

It shall be an unlawful employment practice for an employer—

(1) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

statutorily protected expression. But Johnson's retaliation claim is not based on statutorily protected expression—that is, opposition to an employment practice prohibited by Title VII—so it is not actionable and fails as a matter of law.

In evaluating whether an employee's expression is protected under Title VII, the Eleventh Circuit distinguishes between general complaints of perceived racism and complaints directed to specific, statutorily proscribed employment practices. *See Ceus v. City of Tampa*, 2020 WL 525559 (Feb. 3, 2020) (unpublished) ("Here, Ceus does not allege that [his employer] took any unlawful employment actions: although Ceus generally decries racism with TFR, Ceus does not tie that assertion to any specific discrimination he or anyone else employed by TFR faced."). Only the latter can sustain a claim. But Johnson's complaints do not relate to the Board's statutorily governed employment practices; they concern alleged disparities in the quality of work performed by privately owned, independent contractors. So Johnson's complaints fall outside the scope of Title VII's anti-retaliation provision.

In his response to the Board's motion for summary judgment, Johnson—for the first time—tries to link his complaints to employment practices prohibited by Title VII. Johnson argues that his complaints focus directly on the Board's employment practice of "regular[ly] hiring racially biased contactors and subcontractors based on its policy to hire the 'lowest bidder.'" (Doc 48, p. 2). (Doc. 33 pp. 4–5, 16, 48). This argument fails for at least three reasons.

First, Johnson's argument focuses on the Board's hiring of allegedly racially biased contractors, but Title VII prohibits the *failure* or *refusal* to hire individuals because of their race, not the hiring of outside entities. *See* 42 U.S.C.A. §2000e-2 ("It shall be an unlawful employment practice for an employer . . . [t]o fail or refuse to hire or to discharge any individual . . . because of such individual's race.") Second, none of Johnson's complaints communicated his subjective, good-faith belief that the Board's practice of hiring of contractors constituted unlawful employment discrimination. *See Ortiz v. Waste Mgmt., Inc. of Fla.*, 808 Fed.Appx. 1010, 1013 (11th Cir. Apr. 27, 2020) (unpublished) ("An employee's complaint—formal or informal—about an employment practice constitutes statutorily protected expression if the employee explicitly or implicitly communicate[s] a belief that the practice constitutes unlawful employment discrimination.") Rather, Johnson's complaints focus on the allegedly racially biased workmanship of the contractors. Third and finally, because Johnson makes this claim for the first time in response to the Board's motion for summary judgment and not in his complaint, it is untimely. *See GeorgiaCarry.Org, Inc v. Georgia*, 687 F.3dd 1244, 1258 n. 27 (11th Cir. 2012) ("It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings.").

Because Johnson's complaints do not relate to an employment practice made unlawful by Title VII, they cannot sustain a retaliation claim.

**B. Johnson Has Not Refuted the Board's Legitimate, Non-Retaliatory Reasons for His Termination.**

Even if Johnson could establish a prima facie case of retaliation, his case still fails because Johnson cannot prove that the Board's legitimate, non-retaliatory reasons for firing him are pretext. The Board produced evidence that its decision to terminate Johnson's employment was based on his "ineptitude in discharging the duties of [Athletic Director]" and "poor communication skills marked by impulsive, intemperate, and inappropriate outbursts." (Doc. 26, pp. 1–10, ¶¶ 14, 15, 21; p. 19).

The evidence shows that Dr. Alexander (the COO) recommended Johnson be fired based on performance-related concerns unrelated to Johnson's race or his complaints about the workmanship of Board-hired contractors. (Doc. 25-4, pp. 6–7, ¶ 17). The Superintendent, Dr. Gacutan, accepted Dr. Alexander's recommendation after consulting with senior staff members.

Two points are particularly notable about those decisions. First, Dr. Alexander and Dr. Gacutan are both African-American. Second, Johnson admits that Dr. Gacutan did not know about his complaints about the contractors' work when she recommended that the Board terminate his employment, and Johnson provides no evidence that the Board was aware of his complaints when it voted. The court finds that no reasonable juror could find that the majority-minority Board fired Johnson for making race-based complaints that the Board didn't know about.

That the Board made the final decision[4] is particularly relevant because it shows that Johnson cannot prove an injury, even if Johnson proved that one of his supervisors had a discriminatory motive. Johnson's injury must have resulted from a "policy, statement, ordinance, regulation, or decision officially adopted by [the Board]." *See Butts v. County of Volusia*, 222 F.3d 891, 894, n.4 (11th Cir. 2000) (finding summary judgment proper when plaintiff failed to plead a "custom or practice" for §1983 claim); *Underwood v. City of Fort Myers*, 836 F. Supp. 823, 826–27 (M.D. Fla. 1993) (dismissing §1983 claim because plaintiffs failed to plead that alleged discriminatory conduct resulted from a policy of the defendant).

So even if Johnson could show that Zimmerman, Dr. Alexander, or Dr. Gacutan tried to get Johnson fired based on a discriminatory or retaliatory motive, his claim must still fail because governmental liability cannot depend on the doctrine of *respondeat superior. See Yates v. Cobb Cnty. Sch. Dist.*, 687 F. App'x. 866, 872 (11th Cir. 2017) (unpublished) (holding that a school board may not be held liable under §1983 based on a *respondeat superior* theory); *see also Baker v. Birmingham Bd. Of Educ.*, 2008 WL 11422444 (N.D. Ala.) (holding that a principal's allegedly biased termination recommendation cannot subject the Board to §1983 liability when the principal has no statutory role in the decision-making process and is not

---

[4] Under Alabama law, only the Board possesses final policymaking authority over the hiring and termination of employees. Ala. Code §§ 16-1-30; 16-11-17 (1975).

vested with authority to act as a final municipal policymaker for hiring and firing decisions, and with no evidence the Board knew of and adopted the retaliatory motive ascribed to the principal).

In summary, Johnson's factual allegations neither imply nor establish that the Board's proffered reasons for his termination were a pretext for discrimination. Under Eleventh Circuit precedent, a proffered reason is not pretext "unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). Johnson has not met his burden on either front.

## II.     Johnson's Race Discrimination Claim Fails as a Matter of Law.

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1).

Johnson alleges that the majority black Board terminated his employment and otherwise discriminated against him because of his race in violation of Title VII.[5]

---

[5] As already noted (see *supra*, n. 2), Johnson also alleges race discrimination claims under 42 U.S.C. §§ 1981 and 1983. The same analysis applies to those claims. *See Standard*, 161 F.3d at 1330 ("Standard alleges that he was terminated on the basis of his race and national origin (Caucasian–American), in violation of Title VII and 42 U.S.C. § 1981. Both of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").

To survive summary judgment, Johnson must present enough facts to permit a jury to rule in his favor. One way that he can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973), which is much like the three-part framework set forth in Part I.

Step 1: Under *McDonnell Douglas*, Johnson bears the initial burden of establishing a prima facie case of discrimination by showing: (1) that he belongs to a protected class; (2) that he faced an adverse employment action; (3) that he was qualified to perform the job; and (4) that his employer treated "similarly situated" employees outside his class more favorably. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220–21 (11th Cir. 2019).

However, Johnson can also present direct evidence of discriminatory intent, *see, e.g.*, *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 921–22 (11th Cir. 2018), or show a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination, *see, e.g.*, *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citation and quotation marks omitted).

Step 2: If Johnson makes a prima facie case, the burden shifts to the Board to articulate a legitimate, nondiscriminatory reason for Johnson's termination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Step 3: Should the Board carry its burden, Johnson must then establish that the Board's proffered reason was merely a pretext for unlawful discrimination, an

obligation that "merges with [his] ultimate burden of persuading the [factfinder] that [he] has been the victim of intentional discrimination." *Id.* at 256.

Johnson hardly tries to satisfy the first step in the *McDonnell Douglas* framework, as he implicitly acknowledges that he cannot identify any comparator outside his protected class that the Board treated more favorably. (Doc. 33, p. 28). Nor does Johnson attempt to support his discrimination theory with direct evidence. Instead, Johnson tries to make out a prima facie case by presenting a "convincing mosaic" of circumstantial evidence that would allow a reasonable jury to infer intentional discrimination by the Board. Johnson's attempt falls short of the mark.

### A. Johnson's Evidence Does Not Create an Inference of Discrimination

Johnson's circumstantial evidence does not create a "convincing mosaic" of discrimination, nor does it meet the evidentiary showing necessary to survive summary judgment. Johnson's circumstantial evidence of discrimination can be summarized as follows:

- While Athletic Director, Johnson observed Board-hired contractors perform what Johnson considered poor quality work on the athletic facilities at predominately black schools.

- Johnson compared his observations to the workmanship performed by some of the same contractors at predominately white schools (such as James Clemens High School, the school his children previously attended) and

concluded that the contractors performed worse work at predominately black schools because of racial bias.

- Johnson expressed these concerns to other Board employees, including Zimmerman (the only white member of Dr. Gacutan's senior staff) and Dr. Anderson, and, in response, Zimmerman dismissed Johnson's concerns and countered that the perceived disparities could result from poor maintenance at the school level.

- Edward McMullen, the Board's Purchasing Director and an African American, once "went on a rant about how he was fed up with dealing with minority contractors" because "they were always late on paperwork." *See* (Doc. 33, pp. 15–16, ¶ 2).

- Johnson alleges that as Athletic Director, he had to comply with unreasonable deadlines and was unfairly blamed for problems he did not cause.

- Johnson was misinformed by the Board's African-American President, Randall Woodfin, as to whether his termination was on the Board's agenda before the Board voted to terminate his employment.

These facts, individually and collectively, do not create a "convincing mosaic" of intentional discrimination, but an assortment of minimally probative miscellanies. *C.f. Dukes v. Shelby Cnty. Bd. Of Educ.*, 762 F. App'x. 1007, 1012 (11th Cir. 2019) (holding that "considerably more evidence … is required" to

establish a convincing mosaic than what the plaintiff offered: (1) a specially called meeting where the meeting minutes incorrectly stated the plaintiff was there; (2) the Board's misstatement of their hire's qualifications in their position statement to the EEOC; (3) the fact that no African-American people were employed in the workplace; (4) a Board member's comment that a "black" would be considered if the Board ever received a "decent resumé" from an African American; and (5) the candidate who received the position plaintiff applied for was hired despite receiving a reprimand); *c.f. also, Connelly v. Metropolitan Atlanta Rapid Transit Authority*, 764 F.3d 1358 (11th Cir. 2014) (holding that the plaintiff's circumstantial evidence insufficient to create a reasonable inference of racial discrimination when the plaintiff—a white male—claimed he was fired because he was white and presented evidence that his supervisor—an African-American woman—referred to herself in a racist manner and socialized mainly with other African American employees).

In short, Johnson's circumstantial evidence does not support a reasonable inference that the Board discriminated against him.

## B. Johnson's "Cat's Paw" Theory Fails

Johnson argues that, when it terminated him, the Board was relying on a recommendation tainted by a discriminatory animus originating from white employee Steve Zimmerman—even though Zimmerman was not Johnson's

supervisor and Zimmerman was not the person who recommended the Board terminate Johnson. (Doc. 25-4, p. 2, ¶ 3; p. 5, ¶¶ 12, 13).

Johnson's proposed "cat's paw" theory of liability cannot apply as a matter of law. As discussed in Part I.B., under Alabama law, only the Board, and not any subordinate employee, has final policymaking authority over the hiring and firing of employees. The Board cannot abdicate or delegate its authority to a third party. Nor does the legitimacy of the Board's decision to terminate Johnson turn on whether the Board conducted an "investigation" into the motives of subordinates who may have played an advisory role in the decision-making process. *See McMillan v. Monroe Cnty., Ala.*, 520 U.S. 7812, 786 (1997); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 129 (1988).

Moreover, the Eleventh Circuit has held that an employee's allegation that the ultimate decisionmaker was improperly influenced in some indirect way by an improperly motivated subordinate cannot establish liability. *See Carruth v. Bentley*, 2019 WL 5799323 *5 (November 7, 2019). Instead, Johnson must show that members of the chain of advisory subordinates, including Dr. Gacutan as the penultimate decisionmaker, asserted a "coercive force" over the free will of the Board, as the final decisionmaker, in a way that effectively prevented Board members from exercising independent judgment in voting on Johnson's termination. *Id*. Johnson has made no such allegation or showing in this case. Rather, Johnson

essentially argues that an impermissible motive (ascribed to Zimmerman) was lurking in the background behind the Board's decision to terminate his employment. Putting aside whether Johnson has offered sufficient evidence to create a fact question about whether Zimmerman harbored a discriminatory motive, Johnson has not alleged (much less shown) that Zimmerman exercised coercive control over the Superintendent or over the Board's decision-making process. So Johnson's argument for a "cat's paw" theory of liability fails.

### C. Johnson Has Not Refuted the Board's Legitimate, Non-Discriminatory Reasons for His Termination

Even if Johnson could establish a prima facie case of race discrimination, Johnson's claim still fails because he offers no evidence that refutes the Board's proffered reasons for his termination, which are both legitimate and nondiscriminatory. *See supra*, I.B.

CONCLUSION

For these reasons, the court finds that the Board's motion for summary judgment must be **GRANTED**. The court will issue a separate order that does so.

DONE and ORDERED this **1st** day of September, 2020.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE